FILED

Apr 30 2018, 5:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Brent E. Inabnit
Matthew R. Kaczmarek
Nicholas J. Derda
Sopko, Nussbaum, Inabnit &
Kaczmarek
South Bend, Indiana

ATTORNEY FOR APPELLEES

Thomas M. Dogan
Dogan and Dogan
Portage, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Northern Indiana Public Service Company, <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Aqua Environmental Container Corp. and Joki Leasing, LLC, <br><br> *Appellees-Plaintiffs.* | April 30, 2018 <br><br> Court of Appeals Case No. 91A04-1707-PL-1653 <br><br> Interlocutory Appeal from the White Superior Court <br><br> The Honorable Robert B. Mrzlack, Judge <br><br> Trial Court Cause No. 91D01-1008-PL-10 |

**Kirsch, Judge.**

[1] This interlocutory appeal arises out of a fire that occurred at Aqua Environmental Container Corp.'s ("Aqua") warehouse facility in Wolcott, Indiana, which was owned by Joki Leasing, LLC ("Joki Leasing"). Aqua and Joki Leasing (together, "Aqua" or "Plaintiffs") filed a complaint against

Indiana Public Service Company ("NIPSCO"), alleging that NIPSCO negligently supplied electrical power to the Wolcott area, including Aqua's warehouse, resulting in severe power fluctuations that caused a fire in the area of the ceiling-mounted furnace of Aqua's warehouse. NIPSCO denied all liability for the fire. During discovery, it was determined that Aqua preserved some, but not all, of the ceiling-mounted furnace equipment. NIPSCO filed a Motion for Default Judgment for Spoliation of Evidence, which the trial court denied. NIPSCO appeals and raises the following issue: whether the trial court abused its discretion when it denied NIPSCO's motion on the basis that Aqua did not intentionally spoliate evidence.

We affirm and remand with instructions.

## Facts and Procedural History[1]

In March 2010, Aqua was in the business of swimming pool manufacturing, and it leased a warehouse facility ("the premises") from Joki Leasing. Kirk Sullivan ("Sullivan") is both the president of Aqua and the managing director of Joki Leasing.[2] On the evening of March 28, 2010, a major fire occurred at the premises, in the ceiling area where the furnace was located, and the fire

---

[1] We held oral argument on this appeal on March 29, 2018 in the Court of Appeals Courtroom in Indianapolis, Indiana. We commend counsel for both parties on the quality of their oral and written advocacy.

[2] Kirk Sullivan is president or managing director of twelve or thirteen companies, all of which are involved in some aspect of the swimming pool industry. *Appellant's App. Vol. 3* at 127, 130. Aqua has operations in various locations, including Florida, Louisiana, Arizona, North Carolina, Washington, Canada, China, and Russia. *Tr. Vol. 2* at 208.

destroyed about 12,000 square feet of finished warehouse, office, and factory space.[3] The ceiling furnace assembly is the basis of NIPSCO's spoliation claim.

[4] At around 8:45 p.m. on the night in question, an Aqua sales representative, John Kantor ("Kantor"), was working in the factory showroom area, heard a bang sound, and saw in the ceiling area a glow that he suspected was fire, so he contacted Aqua's property manager, Mike Storz ("Storz"), who lived in a residence located next to the warehouse. Storz called 911, and he and Kantor went back to the premises. Wolcott Volunteer Fire Department Chief Kenneth Burns ("Chief Burns") was the first to respond to the fire, arriving about two minutes after he received the dispatch call. A number of local fire departments responded to the fire, and it did not get fully extinguished until after around 2:00 a.m. Chief Burns called dispatch and requested they contact the Indiana State Fire Marshal to send a fire investigator to the scene to investigate the origin and cause of the fire. *Appellant's App. Vol. 3* at 159.

[5] On his way to the fire, Chief Burns had noticed that the lights to the lumber yard and about five houses in town were "flickering." *Appellees' App. Vol. 2* at 35. He also noticed that the generator at the fire station had started up automatically, which generally occurs if the voltage drops below 200 volts (from the normal 220 volts) and occurs in order to prevent damage to an electric

---

[3] Sullivan stated in his deposition that Aqua was not covered by property insurance. *Appellant's App. Vol. 2* at 80-81; *see also Appellant's App. Vol. 3* at 3 (Plaintiffs' Response to NIPSCO's Motion for Default Judgment, stating that there was no property insurance on the facility).

motor. *Id.* at 28, 38-39. Chief Burns talked to Storz at the scene of the fire, and Storz told Chief Burns that the lights and television at his residence kept flickering and surging, going bright and dim, for forty-five minutes prior to the fire. *Tr. Vol. 2* at 209.

[6] In the morning on March 29, 2010, the day after the fire, Chief of Fire Investigations for the Indiana Department of Homeland Security Division of Fire and Building Safety, Robert Dean ("Fire Marshal Dean"), came to the premises in response to Chief Burns's request for an investigator. Chief Burns also returned to the premises, and he told Fire Marshal Dean that he believed the fire started in the furnace area and may have been caused "by NIPSCO's being low on power." *Appellant's App. Vol. 3* at 161, 163-64. During his investigation, Fire Marshal Dean determined the area of a ceiling-mounted furnace was the area of origin and that the furnace was a possible cause of the fire. *Tr. Vol. 2* at 27-29. The furnace, including a firebox, blower box, and the A/C ductwork (together, "Furnace Assembly") survived the fire. Fire Marshal Dean took the following picture of the entire Furnace Assembly on the day

following the fire, March 29, 2010:



*Ex. Vol. 4* at 159; *Appellant's Br.* at 9.

When he took the picture, Fire Marshal Dean was standing inside the building and under the furnace; because it was unsafe for Storz to accompany Fire Marshal Dean into the burned building, Storz was not with Fire Marshal Dean when he took the picture. At some point, while Storz and Fire Marshal Dean were standing approximately 30 feet outside of the building, Fire Marshal Dean pointed out the furnace to Storz – as they looked through a hole that had been made in the wall of the building during the process of fighting the fire – and Fire Marshal Dean told Storz, "This is a possible cause, you may want to save it for your insurance company or other entities." *Id.* at 31, 222-26. Fire Marshal Dean's March 29, 2010 report concluded that the fire was "accidental[,]" and "[t]he area of origin was in the ceiling of the north portion of the south building. The possibility of an area of internal failure or resistive heating in a ceiling-

mounted furnace could not be ruled out as the ignition source of this event."
*Appellant's App. Vol. 3 at 53.*

[8] Sullivan, who was out of state at the time, delegated responsibility for handling the situation to his uncle, Phil Sullivan ("Phil"), and Storz. Aqua sought estimates to remove the burned part of the building, and within about a week, Phil hired Xtreme Contractors ("Xtreme") for the project. *Tr. Vol. 2 at 243.* Phil and Storz worked with Terry Wilson ("Wilson"), an owner of Xtreme, on the project. Demolition took approximately two weeks, and on or about the third day, Xtreme removed the furnace with a claw or crane and placed it in a cleared-out location that was at least 100 feet from any other objects. According to Xtreme, it cut out and lowered the entire Furnace Assembly, including the firebox, and set it aside. According to Storz, Xtreme saved only the A/C ductwork portion, which is what Fire Marshal Dean had pointed out to him on March 29. *Tr. Vol. 3 at 22; Def't's Ex. 9; Tr. Vol. 8 at 200.* Using a pallet and a forklift device, Storz moved the saved furnace remains to the nearby Aqua warehouse for storage. According to Aqua, the saved furnace remains were untouched for six to eight months, until they were examined by Aqua's experts in the fall of 2010. *Tr. Vol. 3 at 2-7.*

[9] On April 19, 2010, Sullivan traveled from Florida to Wolcott, Indiana to view the premises and meet with Chief Burns. Chief Burns advised Sullivan that NIPSCO's supply of electricity may have played a part in causing the fire. After talking to Chief Burns and a local electrician about NIPSCO having electrical surges on the night in question, Sullivan phoned NIPSCO's claims

division on or around April 22, 2010, spoke to claims adjuster Cindy Jenkins ("Jenkins"), and made a claim.

[10] Jenkins took notes of her conversation with Sullivan, and her "Adjuster Comments" reflect that Sullivan told her that: (1) he had been told by the fire chief and an electrician that NIPSCO had experienced "brownouts" in Wolcott and surrounding communities on the night in question; (2) the fire started in or at a "heater"; (3) the building had been torn down and all that remained was the slab; (4) the "heater" had been saved, and NIPSCO could view it by calling Phil Sullivan, and Sullivan gave Phil's number to Jenkins. *Appellant's App. Vol. 3* at 181, 184. Jenkins sent a follow-up email to Sullivan, stating, "NIPSCO requests that you preserve and maintain any and all equipment, wiring and other facilities from the subject building." *Id*. Jenkins also stated in her email to Sullivan, "As we discussed, since the building has been torn down, NIPSCO would like to view the heater and any other remaining equipment or wiring from the building. They or someone on their behalf will be contacting Mr. [Phil] Sullivan to make these arrangements." *Id.* at 185. NIPSCO did not thereafter contact Aqua to arrange to see the saved furnace.

[11] Several months later, in August 2010, Aqua and Joki Leasing filed a Complaint against NIPSCO and Nisource, Inc., a holding company in the business of distributing electrical utility service in White County, Indiana (together,

"Defendants").[4] *Appellant's App. Vol. 2* at 27-36. Plaintiffs asserted claims for negligence, strict liability, res ipsa loquitur, and breach of implied warranty. *Id*. Among other things, Plaintiffs asserted that Defendants were negligent in the following respects:

> a. Defendants improperly installed, serviced, and maintained the utility service and its various providing implements over which the Defendants maintained exclusive ownership and control;

> b. Defendants failed to conduct proper inspections of its electrical service implements, wiring and equipment and failed to discover the defective condition of their delivery of electricity to Joki Leasing and Aqua Environmental;

> c. Defendants had prior notice of and failed to conduct proper maintenance and/or to repair their transformers and/or other equipment so that their electricity product could safely be delivered to Joki Leasing and Aqua Environmental.

*Id*. at 29. Plaintiffs alleged that "[b]y reason of the defective condition of the electrical delivery system, there was an electrical fire originating in the electrical furnace motor and/or other equipment at the Plaintiffs' property, which resulted in electrical arcing, the generation of excessive heat, and which ignited fire in Plaintiffs' building and property[.]" *Id*. at 29-30, 31-32. In their Complaint, Plaintiffs averred that "The furnace where the fire originated . . .

---

[4] In November 2010, pursuant to the parties' stipulation, Nisource, Inc. was dismissed without prejudice from the action. *Appellant's App. Vol. 2* at 4.

was in good working order and condition, and contained no defect therein prior to or on the night of the fire." *Id*. at 33. NIPSCO filed its Answer and denied all liability for the fire.

[12] Discovery began and continued for years. In August 2014, NIPSCO took Sullivan's deposition, during which he made statements indicating that, after conversations with Aqua's experts and his attorney, he learned that what was salvaged during demolition "wasn't really the right part to keep" or "the most useful part," agreeing that "the wrong part was kept." *Id*. at 48-49, 73, 75. NIPSCO made various requests for production of documents with regard to the furnace, and, in January 2015, Aqua advised that it had no records in its possession regarding the furnace in question, having been destroyed in the fire. *Id*. at 158. In early April 2015, almost five years after the fire, experts for NIPSCO examined, for the first time, the stored furnace remains and determined that Plaintiffs did not have the entire Furnace Assembly and that the "firebox" portion was missing. About two weeks later, on April 15, 2015, NIPSCO filed a Motion for Default Judgment Against Plaintiffs for Spoliation of Evidence ("Motion for Default Judgment"). *Id*. at 47-61.

[13] NIPSCO's Motion for Default Judgment asserted,

> This entire case involves what caused the fire in Plaintiffs' facility. Plaintiffs assert that NIPSCO'S negligence caused the fire. However, they have destroyed the very evidence essential to investigating and testing that theory. As such, that issue cannot be resolved within a reasonable degree of scientific certainty - - by either Plaintiffs or NIPSCO.

*Id*. at 55. NIPSCO also stated, "Plaintiffs claim[] to have no documents in their possession related to the subject furnace." *Id*. at 50. NIPSCO maintained that Plaintiffs' spoliation of evidence makes it impossible to determine the origin and cause of the fire and further prevents NIPSCO from being able to defend itself in this case or assert any non-party defenses against, for example, the manufacturer of the furnace or others. Citing to discovery responses, deposition excerpts, and affidavit testimony, including that of experts, NIPSCO argued, "[A]ll of the experts in this case are in agreement that the origin and cause of the fire cannot be determined within any reasonable degree of engineering and/or scientific certainty - - i.e., any opinion other than 'undetermined cause' would be speculation." *Id*. at 60. Therefore, NIPSCO argued, "Plaintiffs' spoliation warrants a terminating sanction - - i.e., default judgment." *Id*.

[14] Plaintiffs filed a response, asserting that Plaintiffs did not spoliate evidence and "in fact the Plaintiffs made efforts to preserve all of the furnace with its related components that were identifiable after the intense fire." *Appellant's App. Vol. 3* at 7. Plaintiffs opposed NIPSCO's suggestion that, without the entire furnace, Plaintiffs cannot prove their case. In support, Plaintiffs relied on National Fire Protection Association ("NFPA") 921, Guide for Fire and Explosion Investigations. NFPA 921 calls for "developing a hypothesis using inductive

reasoning and after analyzing the available data."[5] *Id.* at 8 (citing to 2011 NFPA 921 4.3.1, *et seq*.). Plaintiffs argued, "[T]he investigator uses the scientific method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences[,]" noting that, under NFPA 921, "[I]n the instance in which the investigator fails to identify the ignition source, the fire need not always be classified as 'undetermined.'" *Id*. at 10-11.

[15] In opposing the Motion for Default Judgment, Plaintiffs asserted that their retained experts, who examined the retained furnace in November 2010, followed the dictates of NFPA 921 in giving their expert opinions that (1) the origin of the fire was in the area of the furnace located in the ceiling of the building, (2) NIPSCO's electrical distribution system was experiencing voltage disturbances due to a failing transformer in a substation, and electronic components and electric motors within the gas furnace were susceptible to damage and failure, and (3) "[d]amage to electrical components which is sufficient to cause failure within the furnace is considered a competent ignition source." *Id*. at 12. Lastly, Plaintiffs argued that, if the trial court were to find

---

[5] NFPA 921 states, "A fire or explosion investigation may include all or some of the following tasks: a scene inspection or a review of previous scene documentation done by others; scene documentation through photography and diagraming; evidence recognition, documentation, and preservation; witness interviews; review analysis of the investigations of others; and identification and collection of data from other appropriate sources." *Appellant's App. Vol. 3* at 9 (citing 2011 NFPA 921, 4.4.3.2).

that Aqua inadvertently destroyed evidence, lesser sanctions than default would be appropriate.

[16] In January 2017, the trial court held a full-day evidentiary hearing on NIPSCO's Motion for Default Judgment. NIPSCO presented the testimony of (1) Fire Marshal Dean, (2) Wilson, owner of Xtreme, and (3) NIPSCO's expert Dr. John Martens ("Martens"), who was employed as a principal engineer at Exponent's Electrical Engineer and Computer Science practice. Fire Marshal Dean, who had been in the field of fire investigations for approximately forty years, stated that when conducting a fire investigation, the specific practice that is followed is NFPA 921, which he characterized as a standard guide for fire investigators. With regard to the Aqua premises, Fire Marshal Dean determined that the furnace area was the likely origin of the fire, and the furnace was "a possible cause." *Tr. Vol. 2* at 27-29. Fire Marshal Dean stated, "I always tell the homeowner or business owner that this is a possible cause, you may want to save it for your insurance company or other entities," *id*. at 31, and, in this case, he so informed Storz, telling Storz that he believed the fire started in the furnace area and that the furnace was a possible cause of the fire and needed to be preserved. *Id*. at 30-35, 37. He recalled that, when he was telling Storz to save the furnace, they were standing outside of the building, and he was pointing to the ceiling area inside the building through a hole in the wall and through possible haze and smoky conditions. *Id*. 37-44, 56. Fire Marshal Dean confirmed that without the entire furnace, "the actual cause and origin" of the fire, or the "actual ignition source," could not be determined. *Id*. at 35,

86, 90. When asked if NIPSCO was prejudiced because the entire furnace was not saved, Fire Marshal Dean responded, "I don't know if they'd be prejudiced. All the evidence is not there." *Id*. at 35.

[17] On cross-examination, Fire Marshal Dean conceded that he did not know whether anyone purposely destroyed evidence, noting "I was not there during deconstruction." *Id*. He also agreed that it was "possible" that the entire furnace broke apart as it was pulled from the roof and that only a portion of it was kept. *Id*. at 50. Fire Marshal Dean recalled that NIPSCO was contacted and asked to come to the scene on March 29, but did not do so. He stated that he had wanted NIPSCO to come to the premises at that time so that he could ask them about any power surge, stating that pursuant to NFPA 921 any power surge would be relevant, explaining, "That would help me to determine the cause of the fire. If you have a power surge, it may have had surge of power in that structure." *Id*. at 58. He also testified that wiring from the substation to the Aqua property, the insides of the Aqua on-site transformer box, the Aqua electrical meter boxes, gas transfer valves, gas regulators, and gas meters, were all relevant to the investigation. *Id*. at 66-73. When asked whether the cause of the Aqua fire could be established without the firebox, Fire Marshal Dean replied, "I don't think it can be established because part of the evidence is gone. The main part of the evidence is gone," *id*. at 66, but he also acknowledged that it is possible to determine cause and origin without the exact ignition source. *Id*. at 92.

[18] Wilson, owner of Xtreme, testified that, at the start of the project, Phil met him at the premises and walked around outside and inside the building "and pointed out the furnace and the duct work." *Id*. at 99. Wilson stated that, on several occasions during demolition, Phil told him that it was important to save the furnace and the ductwork. *Id*. at 98. Wilson also said that Storz and Sullivan were present daily. *Id*. at 103-04, 249. When Wilson was shown the picture taken by Fire Marshal Dean (of the entire Furnace Assembly), Wilson testified that the picture depicted what Phil had instructed him to save. *Id*. at 99-100. Wilson testified that he personally observed that the entire Furnace Assembly, as depicted in Fire Marshal Dean's picture, was recovered. *Id*. at 106-07. Wilson described that Xtreme worked its way carefully toward the furnace and that it was lowered to the floor in a controlled fashion, and the furnace was in at least two pieces. *Id*. at 108. He recalled that the furnace firebox part was sitting on top of the ductwork. *Id*. at 112. He said Phil and Storz were present and observed what was recovered by Xtreme. Wilson testified to watching Storz use a forklift to move the two pieces of the furnace that Xtreme had recovered to a building. *Id*. 111, 115. Counsel for NIPSCO showed Wilson the picture of what Aqua still had in its possession (which was only the ductwork) and asked Wilson:

> Q: So, what you see in that picture is not everything that you pulled out of the building and put on the side?
>
> A No, it's not.

*Id*. at 109.

[19] Next to testify was NIPSCO's expert, Martens, whose area of expertise is in systems and controls and failure analysis of systems and controls. With regard to the Aqua fire, he examined the portion of the furnace that remained, and he followed NFPA 921, which includes documenting the scene, collecting the evidence, defining the problem, gathering the data, analyzing the data, developing hypotheses, testing those hypotheses, and repeating the process. Martens was asked for his opinion as to the origin and cause of the fire, based upon his review of the records and analysis of the only remaining artifacts of the fire, and he replied, "The conclusion I came to was undetermined." *Id*. at 155. He stated that because of the failure to save the furnace, there would be no way to correlate the fire with NIPSCO's supply of electricity, or with any other possible cause and the ignition sequence could be not determined. *Id*. at 159, 161-62. He testified, that without the entire Furnace Assembly, it is impossible to know if the internal components were designed correctly, or whether the furnace was installed correctly or properly maintained. *Id*. at 187-88. In Martens's opinion, the origin and cause of the fire cannot be determined with any reasonable degree of engineering and/or scientific certainty. *Id*. at 160-61.

[20] Martens was asked whether he had any opinions as to whether or not that furnace would have helped the Plaintiffs or the Defendant in this case, and he replied:

> A: Because I'm not able to evaluate it, we can't say anything about it. We don't know what safeguards were in it, we don't

know whether or not they were maintained properly, we don't know if they were designed properly, if they were functioning. Unfortunately, that's the issue that we've had in this project. We don't know enough about what we don't even know.

*Id*. at 174-75. Martens conceded that, under NFPA 921, the failure to determine the ignition source of a fire does not, in every case, automatically require the fire investigator to rule the fire undetermined. *Id*. at 182-83. He also acknowledged that evidence of voltage surges, gas and electric meters, transformer box, electrical conductors downstream, and the furnace were all evidence relevant to establish a cause and origin of the fire. *Id*. at 185-92.

[21]     Aqua presented the testimony of Storz, who recalled power surges occurring as he was trying to watch basketball games, stating that "the lights would get real bright and they would get real dim" for about forty-five minutes before the fire.[6] *Id*. at 209. After Aqua employee Kantor contacted him, Storz called 911 and drove to the Aqua building, and he saw that "the furnace was glowing" in the ceiling. *Id*. at 211. Storz testified that on the morning after the fire, while standing with Fire Marshal Dean thirty feet outside of the building, Fire Marshal Dean pointed through a hole in the wall of the building to the furnace area and told Storz that it should be preserved. *Id*. at 240. According to Storz,

---

[6] In addition to Storz, Aqua also called as a witness NIPSCO employee David Prather, who was a supervisor of two NIPSCO employees, an electric lineman and a gas serviceman, who came to the premises at the time of the fire to shut off electric service and gas service. Prather also testified that the gas and electric meters at the premises were pulled at some point. He was not aware of any photographs that had been taken of the premises, meters, or Aqua's transformer box.

he could not see the firebox portion of the furnace from his view. *Id.* at 220-26, 242; *Tr. Vol. 4* at 158. On cross-examination, Storz explained that he never said anything to Fire Marshal Dean such as "I can't really see what you're talking about" or otherwise asked Fire Marshal Dean to further explain what he meant should be preserved, because "I knew what the furnace was" and "I was exposed to it regularly," having had experience with changing the filters in it. *Tr. Vol. 3* at 15-16.

[22] Storz stated that he told Wilson of Xtreme to "save the entire furnace" and that he had pointed it out to Wilson in the same way that Fire Marshal Dean had pointed it out to him, from the same angle and the same hole in the wall. *Tr. Vol. 2* at 245. Storz stated that he did not recall going into or walking through the building with Wilson and that, if Phil had done so, he was not aware of it. *Id.* Storz stated that, through the demolition process, he reminded Wilson repeatedly to make sure to keep the furnace. *Id.* at 250. Storz recalled that on about the third day of demolition, Xtreme removed the furnace. Storz described that he was doing other Aqua work when Wilson came up to him and said, "There's your furnace over there," pointing to an area by the side of the building near the dumpster. *Tr. Vol. 3* at 2. Storz stated that he did not observe it being pulled from the building. *Id.* at 3. Storz stated that the only piece that was saved and set aside on the ground by the dumpster is what is depicted in this picture:



*Id*. at 22; *Ex. Vol. 8* at 200. Storz testified that he believed what he saw was the "whole furnace," and he took it by pallet and forklift to a pole barn, where it stayed for five or six years. *Tr. Vol. 3* at 6-7, 11. He stated that at no time during those years did he remove or move anything. Storz stated that Aqua did not know that anything was missing until NIPSCO experts came to examine the remains, in April 2015, about five years after the fire. *Id.* at 8, 11.

[23] In addition to witness testimony, the parties submitted deposition and other documentary evidence for the trial court's consideration, and the trial court took NIPSCO's Motion for Default Judgment under advisement. The parties each submitted proposed findings of fact and conclusions of law, and, on March 31, 2017, the trial court entered its Order on Defendant's Motion to Strike and Motion for Default Judgment for Spoliation of Evidence ("the Order"), denying NIPSCO's Motion for Default Judgment. *Appellant's App. Vol. 2* at 17-26. The Order determined, among other things, that (1) Plaintiffs had a duty "to preserve the furnace," (2) the duty arose on April 22, 2010 "when Sullivan initiated the claim process," and (3) the "furnace" saved by the Plaintiff[s] did not contain certain parts that could be examined by experts to

possibly determine the origin and cause of the fire. *Id.* at 23-24. The trial court's findings noted that (1) no pictures were produced by either party of the furnace when Xtreme removed it and placed it in the side area or when Storz moved the furnace to the pole barn, and (2) April 1, 2015, almost five years after the fire, was the first time that the "furnace" was inspected by NIPSCO. *Id.* at 20-21.

[24] The trial court's conclusions included the following:

> Conclusion 17. Based upon the evidence presented, it is [] reasonable to consider that the evidence could have been spoliated by Xtreme Contractors, during the demolition process and the excavating of the furnace from the damaged building by the use of their heavy equipment.

> Conclusion 22: Based upon the evidence presented, the Court cannot conclude that the Defendant proved that the Plaintiffs breached their duty to preserve evidence, when back in April of 2010, every indication suggested that they had done so, since the Court is not convinced that what Xtreme Contractors identified as being the furnace, was any different from what Mike Storz identified as being the furnace that he moved into the pole barn.

> Conclusion 24: It would have been helpful, if the [D]efendant had had employees or others at its direction come to the fire scene when [Fire Marshal] Dean conducted his fire inspection, or when the furnace was taken down by Xtreme Contractors, or within a short period of time after the furnace was taken down, rather than some five years later when the furnace was examined by its experts. The Defendant is an electric and gas company. Surely the Defendant would have had employees available who could have determined at that time whether all of the salvageable parts of the furnace were either there or not there.

*Id*. at 24-25.  The trial court denied NIPSCO's Motion for Default Judgment. *Id*. at 26.  NIPSCO now appeals.[7]

# Discussion and Decision

NIPSCO asserts that Aqua spoliated evidence, namely, the furnace, which prevented NIPSCO from investigating and, ultimately, defending itself against Aqua's claims, and, therefore, the trial court should have granted its Motion for Default Judgment.  "Spoliation is a particular discovery abuse that involves the intentional or negligent destruction, mutilation, alteration, or concealment of physical evidence."  *Popovich v. Ind. Dep't of State Revenue*, 17 N.E.3d 405, 410 (Ind. Tax Ct. 2014).  We vest trial courts with wide discretion in dealing with discovery matters and will reverse a trial court's decision regarding discovery only for an abuse of discretion.  *WESCO Distribs., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 703 (Ind. Ct. App. 2014), *trans. dismissed*.  We will find an abuse of discretion only if it is clearly against the logic and circumstances before the court, or when the trial court has misinterpreted the law.  *Prime Mortg. USA, Inc. v. Nichols*, 885 N.E.2d 628, 648-49 (Ind. Ct. App. 2008).  This court has recognized, "'Although a default judgment plays an important role in the

---

[7] In May 2017, NIPSCO filed a Motion for Certification of the Order, a hearing was held, and in July 2017, the trial court entered an order certifying the Order for interlocutory appeal. *Appellant's App. Vol. 3* at 219-20. In its certification order, the trial court indicated the issues to be addressed in the appeal are "(1) whether or not the Plaintiffs spoliated evidence, specifically the furnace, which they had under their control following the fire; and (2) whether a party can avoid a finding of spoliation by delegating a duty to preserve evidence to a third party." *Id*.

maintenance of an orderly, efficient judicial system as a weapon for enforcing compliance with the rules of procedure and for facilitating the speedy determination of litigation, in Indiana there is a marked judicial deference for deciding disputes on their merits and for giving parties their day in court[.]'" *Id.* (quoting *Charnas v. Estate of Loizos*, 822 N.E.2d 181, 185 (Ind. Ct. App. 2005)); *see also Shirey v. Flenar*, 89 N.E.3d 1102, 1111 (Ind. Ct. App. 2017) (reversing trial court's grant of summary judgment to doctor on patient's spoliation claim against him for failing to preserve her medical records, noting "our general preference for letting even marginal cases proceed to trial").

[26]    A party raising a claim of spoliation must prove that (1) there was a duty to preserve the evidence, and (2) the alleged spoliator either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence. *Popovich*, 17 N.E.3d at 410 (citing *Glotzbach v. Froman,* 854 N.E.2d 337, 338-39 (Ind. 2006) for the proposition that the duty to preserve evidence may be assumed voluntarily or imposed by statute, regulation, contract, or certain other circumstances). In this case, the trial court found that Plaintiffs "had a duty to preserve the furnace" and that it arose when Sullivan spoke to NIPSCO claims adjuster Jenkins in April 2010, which began the claims process, and she specifically told Sullivan to preserve the furnace and wiring. *Appellant's App. Vol. 2* at 24. We agree with the trial court that Aqua had a duty to preserve the furnace, in its entirety, and, on appeal, Aqua does not appear to dispute that it had a duty to preserve it. *Appellees' Br*. at 37-38 (stating that "[t]rial court

correctly determined that the duty to save the furnace arose when [] Sullivan telephoned his claim in to NIPSCO").

[27] We disagree, however, with the trial court's determination that the duty arose when Sullivan spoke to NIPSCO adjuster Jenkins, on April 22, several weeks after the fire. Instead, we find that the duty arose at or near the time of the fire, on March 28 or 29, 2010, when Chief Burns told Storz that he suspected the fire originated in the furnace area and when Fire Marshal Dean pointed out the furnace to Storz and told him that Aqua needed to preserve it. We find that, at that time, Plaintiffs knew, or at the very least, should have known, that litigation was possible, if not probable. Indeed, the timeline of events indicates that Aqua was aware of the need, if not its duty, to preserve the furnace because Storz and Phil repeatedly instructed Xtreme during the demolition process to preserve the entire furnace.[8]

---

[8] NIPSCO observes that the trial court, in reaching its decision to deny NIPSCO's Motion for Default Judgment, relied in part on the finding that the evidence could have been spoliated by Xtreme, as opposed to Aqua. *Appellant's App. Vol. 2* at 24-25. NIPSCO asserts that Aqua's duty to preserve should be considered a non-delegable duty, arguing, "[R]egardless of whether it was Xtreme's actions or those of Plaintiffs, the fact is [that] the entire Furnace Assembly existed following the fire, as confirmed by Fire Marshal Dean's photographs, and it was not preserved by Plaintiffs. It was either Plaintiffs' own conduct or that of Xtreme that caused the spoliation of crucial evidence. In either instance, Plaintiffs bear the responsibility for this spoliation of evidence." *Appellant's Br.* at 24-26 (citing *Himes v. Woodings-Verona Tool Works, Inc.*, 565 N.E.2d 469 (Minn. Ct. App. 1997); *Patton v. Newmar Corp.*, 538 N.W.2d 116, 119 (Minn. 1995); *Trull v. Volkswagen of Am., Inc.*, 187 F.3d 88, 91 (1st Cir. 1999)). We agree that, even if it was Xtreme that failed to save all the furnace parts, Aqua may not avoid its duty to preserve the furnace. Rather, if Aqua believes that it was harmed by Xtreme's spoliation of the evidence, its remedy would be an independent cause of action for third-party spoliation of evidence against Xtreme. *See Shirey v. Flenar*, 89 N.E.3d 1102, 1110-11 (Ind. Ct. App. 2017) (discussing car accident plaintiff's third party spoliation claim against her physician for his failure to preserve her medical records, which she needed to substantiate her personal injury claim related to the car accident); *Thompson ex rel. Thompson v. Owensby*, 704 N.E.2d 134, 136 (Ind. Ct. App. 1998) (dog bite plaintiffs

[28]  Having found that Aqua had a duty to preserve the furnace, the next inquiry is whether Aqua "either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence." *Popovich*, 17 N.E.3d at 410. There is no dispute that part of the Furnace Assembly, including the "firebox," is no longer in existence. Aqua maintains that it did not spoliate evidence because (1) it saved exactly what Xtreme had recovered from the building, (2) Storz believed that what he moved to storage was exactly the same as what Fire Marshal Dean had pointed out to him, and (3) Aqua did not know that any part of the Furnace Assembly was missing, until NIPSCO attorneys came to examine the remains approximately five years after the fire. *Tr. Vol. 3* at 8, 11. Aqua argues, "[T]he evidence is clear that both Aqua and Xtreme made all reasonable efforts to save the entire furnace" and, therefore, "NIPSCO failed to show that either Aqua or Xtreme intentionally destroyed or discarded the furnace components." *Appellees' Br*. at 36. The trial court agreed and determined that there is no evidence that Aqua "intentionally destroyed evidence" or "intentionally failed to save evidence." *Appellant's App. Vol. 2* at 25. We, too, find that the record does not support a finding that that Aqua intentionally spoliated evidence; however, the inquiry does not end there.

---

had claim for spoliation of evidence against liability insurer of dog owners' landlord for the insurer's failure to preserve dog-restraining cable that it took possession of during investigation), *trans. denied*.

In the Order denying NIPSCO's Motion for Default Judgment, the trial court acknowledged that Indiana recognizes negligent spoliation of evidence, *id*. at 23-24, but it did not expressly make any finding about whether negligent spoliation occurred on the facts of this case. Upon review, we find that it did. That is, as discussed above, Aqua had a duty to preserve the entire furnace, but, as Aqua concedes, "apparently inadvertently, some of the furnace components were not saved." *Appellees' Br*. at 36. Stated differently, Aqua negligently destroyed or failed to save – that is, spoliated – evidence relevant to its lawsuit.

Our Supreme Court has recognized that "[t]he intentional or negligent destruction or spoliation of evidence cannot be condoned and threatens the very integrity of our judicial system." *Gribben v. Wal-Mart Stores, Inc.,* 824 N.E.2d 349, 354 (Ind. 2005). However, a finding of spoliation alone does not necessarily require the imposition of sanctions. *Popovich*, 17 N.E.3d at 410 (citing *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 189-90 (Ind. 2011)). Rather, a trial court has broad discretion to redress spoliation of evidence; its power to sanction spoliation is derived from its broad and inherent discretionary powers to issue evidentiary rulings and to manage the orderly and expeditious disposition of cases. *Id*. Indiana Trial Rule 37(B) also authorizes trial courts to respond to discovery violations with such sanctions "as are just," which may include, among others, ordering that designated facts be taken as established, prohibiting the introduction of evidence, dismissal of all or any part of an action, rendering a judgment by default against a disobedient party, and

payment of reasonable expenses including attorney fees.[9] *Gribben,* 824 N.E.2d at 351. Additionally, if spoliation by a party to a lawsuit is proved, rules of evidence permit the jury to infer that the missing evidence was unfavorable to that party. *Glotzbach*, 854 N.E.2d at 338.

[31] When deciding whether to sanction a party for the spoliation of evidence, courts consider two primary factors: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party. *Popovich*, 17 N.E.3d at 410; *see also WESCO Distribs., Inc.*, 23 N.E.3d at 703 (trial court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice). Culpability can range along a continuum, from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation. *Howard Reg'l Health Sys.*, 952 N.E.2d at 189 (quoting *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F.Supp.2d 598, 613 (S.D. Tex. 2010)). Prejudice likewise can range along a continuum, from an inability to prove claims or defenses to little or no impact on the presentation of proof. *Id.* "[I]f there is an inadvertent loss of evidence but severe prejudice to the opposing party, that [] will influence the appropriate response, recognizing that sanctions (as opposed to other remedial steps) require some degree of culpability." *Id.* at 189-90.

---

[9] The destruction or concealment of evidence may be prosecuted as a felony for obstruction of justice. *Kelley v. Patel*, 953 N.E.2d 505, 509 n.6 (Ind. Ct. App. 2011) (citing Ind. Code § 35-44-3-4).

[32] Here, as to culpability, NIPSCO argues that the entire Furnace Assembly survived the fire, as captured by Fire Marshal Dean's picture on March 29, and "The fact that the Plaintiffs had possession and control of the Furnace [Assembly] and then allowed the destruction of that evidence demonstrates culpability on Plaintiffs' part." *Reply Br.* at 10. Aqua maintains, however, that what was saved by Xtreme and what Storz moved into a pole barn for storage is exactly the same as what was pointed out to Storz by Fire Marshal Dean as they stood outside the building on March 29. Aqua further observes that NIPSCO had plenty of time and opportunities to examine the wreckage and to conduct any tests and examinations its representatives wished to conduct, but that it waited five years to do so. Jenkins's notes following her April 22, 2010, conversation with Sullivan reflect that she told Sullivan, "NIPSCO would like to view the heater and any remaining equipment or wiring from the building. They or someone on their behalf will be contacting Mr. [Phil] Sullivan to make these arrangements." *Appellant's App. Vol. 3* at 185. However, NIPSCO's experts did not come to view the salvaged furnace part until 2015.

[33] As to the other prong of the balancing inquiry, resulting prejudice, NIPSCO contends that it was severely prejudiced by the failure to preserve portions of the furnace, asserting that Plaintiffs will testify that there were no problems with the furnace and that it was properly installed and maintained, but NIPSCO has no way to investigate or refute this assertion, including pursuing any non-party claims, thus impeding its ability to defend itself. *Reply Br.* at 15. NIPSCO also maintains that the cause of the fire can never really be determined without the

entire furnace. NIPSCO refers to the testimony of Fire Marshal Dean, who agreed that without the firebox part of the furnace, the "ignition sequence" and cause of the fire cannot be established. *Tr. Vol. 2* at 66, 86. NIPSCO expert Martens similarly testified that the cause of the fire cannot be determined without the full furnace, stating, "We don't know if the control system has low voltage detection, we don't know if it has a flame roll-off sensor, we don't know if it has a high temperature sensor, we don't know if it has a combustion air switch. We don't know if any of those were designed correctly. We don't know if they were installed correctly or maintained. I mean, these are all problems we have." *Id*. at 187.

[34] Aqua asserts that NIPSCO is not prejudiced by the missing evidence "any more than Aqua is," and, moreover, "no party is required to preserve evidence beyond reasonable limits." *Appellees' Br*. at 24. Furthermore, Aqua argues, Fire Marshal Dean stated that, pursuant to NFPA 921, it is possible to determine the cause and origin of a fire without having the exact ignition sequence. *Tr. Vol. 2* at 91-92.

[35] We find that the culpability versus prejudice balancing act, namely, the prejudice to the non-spoliating party versus the culpability of the spoliating party, is best left to the trial court. *WESCO Distribs., Inc*, 23 N.E.3d at 702 (recognizing that determination of appropriate sanction for spoliation is left to trial court's discretion). And as we have observed, "[A] variety of spoliation remedies are available to a party to litigation, such as 'potent' discovery sanctions and an inference that the spoliated evidence was unfavorable to the

party responsible." *Shirey*, 89 N.E.3d at 1007. We affirm the trial court's determination that Aqua did not intentionally spoliate evidence, but remand with instructions to the trial court to determine the appropriate remedy, if any, for Aqua's negligent spoliation of evidence.

[36] Affirmed and remanded.

[37] Bailey, J., and Pyle, J., concur.