

FILED

Apr 27 2020, 7:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cody Cogswell
Cogswell & Associates
Fishers, Indiana

ATTORNEY FOR APPELLEE

Dawn E. Wellman
Allen Wellman McNew Harvey, LLP
Greenfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Paternity of A.J.;

Coby Lee Jent,

*Appellant-Petitioner,*

v.

Jerrilee Cave (Jent),

*Appellee-Intervenor,*

and

Elizabeth Stevens,

*Appellee-Respondent.*

April 27, 2020

Court of Appeals Case No.
19A-JP-1045

Appeal from the Madison Circuit Court

The Honorable G. George Pancol, Judge

The Honorable Kevin M. Eads, Magistrate

Trial Court Cause No.
48C02-1709-JP-283

**Najam, Judge.**

# Statement of the Case

Coby Lee Jent ("Father") appeals the trial court's judgment awarding custody and support to Jerrilee Cave ("Mother") with respect to their minor child, A.J. ("the Child"). Father raises the following four restated issues for our review:

> 1. Whether the trial court clearly erred when it awarded custody of the Child to Mother.
>
> 2. Whether the trial court's support order is clearly erroneous.
>
> 3. Whether the trial court abused its discretion when it concluded that Mother had not committed spoliation of evidence.
>
> 4. Whether the court erred when it did not order Mother to pay Father's attorney's fees.

We affirm.

# Facts and Procedural History

During their marriage, Father and Mother used a surrogate to become the parents of the Child. Thereafter, Father and Mother dissolved their marriage, and, through a separate paternity proceeding, they sought to establish their respective custody and support rights and obligations with respect to the Child. Following several fact-finding hearings, the paternity court found in relevant part as follows:

11. From early July[] 2016[] until February 22, 2017, [Mother] had exclusive care of [the Child] without the benefit of any type of court order. She continued to have the care of [the Child] by successive temporary guardianship orders until September 20, 2017.

12. In a September 20, 2017, guardianship hearing, Father presented the paternity affidavit . . . executed immediately following [the Child's] birth. The September 20 hearing resulted in an order transferring temporary care of [the Child] to Paternal Grandmother . . . and setting an emergency hearing in the paternity case for September 27, 2017.

* * *

14. Following the emergency hearing . . . , an Interim Custody Order was entered on September 28, 2017, which granted temporary custody to [Father]. . . .

* * *

17. Father and [Mother] raised [the Child], and although their family knew that a surrogate had been used, and that [the Child] was not conceived [with Mother], the parties and their families looked upon [Mother] as [the Child's] mother and they all held [Mother] out to the world as such. [Mother] was referred to by all as "mother."

18. Following [the Child's October 2011] birth, [Mother] took time off from her veterinary practice until March[] 2012[] to care for her. Thereafter, as both Father and [Mother] worked most weekends, Paternal Grandparents had [the Child] for increasing amounts of time on the weekends until it came to be the practice

that Paternal Grandparents had [the Child] throughout most weekends.

19. Shortly after birth, [the Child] was diagnosed with . . . an enzyme deficiency condition which made it difficult for her to digest fats. Father only attended one of [the Child's] numerous medical appointments. [Mother] took [the Child] to all of these appointments, including those at Riley's Children's Hospital. [Mother] also did the feedings.

20. The parties also agree . . . that [the Child] knew and considered [Mother] as her [m]other . . . .

21. From 2014 on, Father spent at least nearly half of each week, and at times more, at a game preserve business in Ohio in which the parties were involved as part owners. During his time at the preserve, Father generally did not telephone or otherwise maintain any contact with [the Child], even when he was away on [the Child's] birthdays in 2014 and 2015.

22. Although childcare providers were used while [Mother] worked, and although Father had involvement in [the Child's care], and although Paternal [G]randparents also had regular time with, and care of[,] [the Child], the court concludes that the clear weight of the evidence is that [Mother] was the primary caregiver for [the Child] from birth until the earlier referenced September 20, 2017, order.

23. Father and [Mother] attempted reconciliation in September or October, 2016, and Father returned home. However, the reconciliation effort failed in less than two weeks and Father again left the home. Once again, Father left [the Child] in [Mother's] care.

24.      . . . [I]t is clear that Father left [the Child] in [Mother's] care in July[] 2016[] and again in October[] 2016.  He moved to Tennessee in November[] 2016, and [the Child] remained with [Mother].  Despite his pleadings, Father did not vigorously pursue substantive steps to change that until [the] September 20, 2017, order.

25.      In November[] 2016, Father relocated to Tennessee, seeking employment there and taking up residence with Kristi Myers, with who[m] Father had begun a relationship a few months prior which precipitated the end of his marriage to [Mother].  Father has since married Ms. Myers.

26.      Despite past work experience in auto body repair and other job history, Father was initially employed in Tennessee for $10.00 an hour.  In March[] 2017, he obtained employment with a correctional facility, has advanced there, and now earns $17.91 an hour.  He currently works 7:00 P.M. to 7:00 A.M. on a rotating schedule of two days on and three days off with an additional mandatory day every two weeks.  He also works overtime.

27.      In reviewing all of the evidence, the court concludes that Father has abdicated much of [the Child's] care to his current wife for the period he has had custody following the September 28, 2017[,] order.  The court further concludes and finds that this follows a pattern whereby Father has historically deferred to others as the primary caregivers for [the Child].  Prior to his current wife, Father mostly deferred to [Mother] and his parents during the marriage and he certainly . . . deferred to [Mother] from July[] 2016 until September[] 2017.

28.      Bother Father and [Mother] have filed various contempt affidavits . . . .  The court concludes that both parties have been less than fully compliant with the respective visitation orders in

these actions. Although the court could parse the allegations and counter-allegations and the evidence thereon *ad na[usea]m*, the court concludes that Father has been less compliant than . . . [Mother]. Perhaps one of the clearer examples is Father's interference with [Mother's] telephone visits and Father's failure to implement the video chat provision of [Mother's] visitation. The court finds Father's explanation of why he could not provide any video chat ability as extremely weak and simply not creditable.

29. Father is the only blood relative that [the Child] has in Tennessee. Paternal uncle and Paternal Grandparents reside close to the former marital home, as do [Mother's] parents and [Mother's] adult son, with who[m] [the Child] also has long and close ties. [The Child] has a relationship with each of these adults; and in particular, she has an especially close relationship with Paternal Grandparents. From a very early age until Father's and [Mother's] separation, [the Child] had spent most weekends with Paternal Grandparents.

\* \* \*

36. The court concludes that [the Child] was prompted by someone in Father's [current] home to level disturbingly serious allegations against [Mother] which [the Child] later recanted. Whether the prompting was by Father, the current Mrs. Jent, or with the participation of both, is unknown. There is no evidentiary corroboration for the allegations, some of which were the following:

A. That [Mother] had threatened to kill the current Mrs. Jent's minor son;

B. That [the Child] feared [Mother would kidnap her[;]

C. That [the Child] was forced to sleep and shower with [Mother] and an adult female friend[.]

37. The current Mrs. Jent is [the Child's] primary caregiver in Father's home.

38. The current Mrs. Jent is overwhelmingly the primary contact between Father's household and [the Child's] school in Tennessee.

39. The court concludes that, although [Mother] is not [the Child's] biological or adoptive Mother, from [the Child's] perspective, [she] **is** Mother.

40. The number of times that Father's counsel and witnesses referred to [Mother] in these proceedings as "Mother" is also tellingly confirmatory that the people in [the Child's] world perceive [Mother] in that role.

* * *

42. The court credits [family counselor] Dr. [Jonni] Gonso's trained and experienced observations. Among these were her interview observations of the respective parties with [the Child] where she noted a direct contrast between [the Child's] interactions between her Father on the one hand and [Mother] on the other. Dr. Gonso found interaction between Father and [the Child] was largely absent of signs of affection whereas there was ample demonstration of affection between [the Child] and [Mother] as well as play interaction. Dr. Gonso also found indications that [the Child] had been coached from Father's end. Based upon observations of Father and her interviews with him, Dr. Gonso found Father to lack "empathy" for [the Child]. Basically, Father lacks an appreciation for the fact that [the

Child] is a separate person who has her own feelings and beliefs. The court draws further support for this opinion from Father's testimony as he acknowledged that [the Child] knew [Mother] as her mother; yet, somehow, he maintains that [the Child] now does not even want to talk to [Mother] any more.

43.     For its own part, the court has been able to observe the demeanor of both Father and [Mother] extensively throughout the numerous hearings relating to these cases. The court noted for itself a certain unnatural detachment in Father's demeanor throughout much of the proceedings. This is not to say that the court doubts Father's love and care for [the Child]; the court has no doubts in that regard. But[] it does underscore the various witness[es'] testimonial observations, from [Mother], to childcare providers, to Dr. Gonso, that Father is likely not nearly as interactive with his daughter as is [Mother], and his and [the Child's] demonstrative affections are not as frequent[] as they are between [the Child] and [Mother]. In short, Father is more remote as a parent and has historically allowed others to fill a more regular interactive role with [the Child].

44.     Father missed at least half of his visits prior to obtaining temporary custody. . . .

45.     Dr. Gonso's professional opinion was that [Mother] is [the Child's] "psychological parent" with who[m] she has primary attachment and that [Mother] is critical to [the Child's] proper emotional development. Without [Mother], Dr. Gonso has opined that [the Child] would be at enhanced risk of developing problems in her own identity formation, difficulties in forming and having adult relationships, and developing trust in others. Dr. Gonso testified that it is well accepted that there is a hierarchy to the attachments that a child forms. Dr. Gonso's opinion is that [the Child's] primary attachment is to [Mother] and that the strength of [the Child's] attachment to Father is to a lesser degree than the attachment she has with Paternal

Grandparents. The court gives due weight to Dr. Gonso's observations and opinion.

46. The court has deep concern should [the Child] be compelled to abandon her historic relationship with the woman she has always recognized as her mother.

47. The court finds that both parties have acted in a manner that has put [the Child] in the middle of their disputes. However, [Mother's] sins in this respect have been the lesser of the two. In the aggregate, the court finds that [Mother] has the far greater tendency than Father to put [the Child's] interests first.

48. Examples of Father's failure to put [the Child] first are numerous: Father does not appear to recognize [the Child's] perception of [Mother] as her *de facto* mother nor does he appreciate her need for that relationship to continue. He has acknowledged that he did not provide any type of support for his daughter during the time she was in [Mother's] care. He twice separated from [Mother] and left [the Child] with [Mother] in the marital home and then took over a year after the initial separation, and almost a year after the final separation, before making any serious and concerted effort to obtain her. He has either actively participated, or sat passively by, while [the Child] was coached into making horrendous allegations against [Mother] which are without any evidentiary support and which allegations [the Child] subsequently recanted. He has not sought any counseling for [the Child] other than what limited counseling was available for free from her school. Father has pled a lack of sufficient finances for this[,] but[] Father has spent not a single dime of his own funds for any of these proceedings. Nor is there the prospect that he will have to pay anything as his parents appear to have paid his expenses as a gift. He has removed [the Child] to Tennessee, removed from other family with whom his daughter has significant relationships, especially Paternal Grandparents.

49.     The court finds that [Mother] certainly has her faults.  For example, the court credits the evidence as establishing that Father's house, perhaps largely because of the efforts of the current Mrs. Jent, is neat and orderly.  In contrast, [Mother's] home is cluttered and not as tidy as Father's.  However, the court finds that the evidence shows this was also the state of the marital home during the time [Mother] and Father were together . . . .  Further, the court concludes that both Father and [Mother] have displayed more than a few incidents of spitefulness and [the Child] has been in the middle of this.  However, [Mother] appears to have made some improvements in reducing her spite whereas Father has not.  [Mother] failed to diligently pursue adoption following [the Child's] birth.

Appellant's App. Vol. 4 at 204-15.

[4]     In light of its findings, the court concluded in relevant part as follows:

Indiana law recognizes the fundamental rights that parents have regarding their children[,] and, thus, there is a strong presumption that a parent should have custody of their child. . . .

It is not at all easy for a non-parent to overcome this presumption; . . . to do so, they must establish, by clear and convincing evidence[,] that the child's best interest requires that custody be with the non-parent. . . .

* * *

The court concludes that [Mother] has established, by clear and convincing evidence, that [the Child's] best interest is that she be in [Mother's] custody.  This conclusion has not been drawn lightly.  Again, the court is most mindful of the presumed primacy of Father's parental claim to custody.  In the end, the court concludes that Father has historically abdicated much of

the parenting responsibilities to others, principally to [Mother] most of all. Currently, and most clearly, he has appeared to abdicate to his current wife. The emotional bond between [the Child] and [Mother] is one of mother and child, despite the fact that [Mother] is not legally mother. To sunder that bond holds palpably and potentially devastating consequences for this child. The potential damage to her emotional development and adverse consequences for her as an adolescent and as an adult are significant. Thus, the clear advantage in placing custody with [Mother] is the maintenance of [the Child's] bond with the woman she knows as her "mother" and helping better secure [the Child's] emotional development. [Mother] can also keep [the Child] in closer contact with her locally based Paternal Grandparents with whom she has a deep attachment.

* * *

[Mother] has indicated that she is not seeking child support from Father. However, the court does not view it appropriate that there not be some measure of support. Father shall pay [Mother] child support of $75.00 per week . . . .

Father requests sanctions for [Mother's] redaction of materials from her Face[b]ook entries prior to producing those. [Mother] acknowledged that she did make redactions on the basis of one of her prior attorneys indicating that they did not want to see any "drama" on Face[b]ook. What inference is to be drawn from the redactions? The court concludes that the redactions would have likely shown more . . . unkind commentary about Father, the type that both parties have made about the other throughout their divorce.

Father has requested attorney fees and expert expenses for [Mother's] deletion of Facebook materials requested in production. Father advances a spoliation argument that is not

without some degree of merit. Both sides have alleged various violations by the other in support of fee requests . . . .

Although both Father and [Mother] fell short of adhering to the visitation orders, Father more so than [Mother], the court will not make any contempt findings . . . . As for the respective requests for attorney fees and expenses, the court leaves each party to pay their own attorney's fees and expenses. However, the court does order that Father reimburse [Mother] for $5,000.00 of Dr. Gonso's fees . . . . In reading this decision, the court notes that Paternal Grandparents have paid all of Father's legal costs and Father has paid none. Paternal Grandfather testified that the payment of these fees w[as] a gift to Father and they do not seek repayment.

*Id.* at 215-19. This appeal ensued.

# Discussion and Decision

## *Issue One: Custody*

[5] On appeal, Father first asserts that the trial court erred when it ordered that Mother have custody of the Child. The court's judgment on custody followed its entry of written findings of fact and conclusions thereon after an evidentiary hearing.[1] We review such judgments under our clearly erroneous standard. *E.g.*, *Salyer v. Washington Regular Baptist Church Cemetery*, 141 N.E.3d 384, 386 (Ind. 2020) (per curiam). A judgment is clearly erroneous when the court's findings of fact do not support its legal conclusions or when the legal

---

[1] We compliment the trial court on the quality of its findings and conclusions.

conclusions do not support the ultimate decision. *M.H. v. Ind. Dep't of Child Servs. (In re Ma.H.)*, 134 N.E.3d 41, 45 (Ind. 2020). We do not reweigh the evidence or judge witness credibility, and we consider only the evidence and reasonable inferences therefrom that support the trial court's judgment. *Id.*

[6] Father asserts on appeal that, because he is the only biological parent of the Child in this matter, Mother's evidence could not overcome the legal presumption that he should have custody. But Father does not suggest that the trial court applied an incorrect legal standard when it evaluated the appropriate custody arrangement here; he merely asserts that we should assess the evidence on appeal differently than how the trial court assessed it. We cannot do so. *Id.*

[7] The controlling factor in custody determinations is the best interests of the child. *See J.I. ex rel. K.I. v. J.H.*, 903 N.E.2d 453, 459-60 (Ind. 2009). The evidence most favorable to the trial court's judgment supports its award of custody to Mother. For example, the evidence shows, as the trial court found, that Father routinely failed to put the Child first; he abdicated his parental role with her on numerous occasions, leaving that responsibility to, most notably, either his parents or Mother; he interfered with and refused to recognize Mother's role in the Child's life as the Child's only known mother figure; and he either passively or actively permitted the Child to be instructed to levy unfounded and harmful accusations against Mother. Conversely, Mother is well bonded to the Child and vice versa; Mother has been engaged and active in the Child's development; and awarding custody to Mother enabled the Child to

maintain other important family relationships, especially with the paternal grandparents.

[8] Further, we conclude that Father is estopped from his attempt to discount and disparage Mother's relationship to the Child. In *Levin v. Levin*, the Indiana Supreme Court affirmed the opinion of this Court and held that father was estopped from denying that a child conceived through artificial insemination was a child of the marriage, stating that "[t]o hold otherwise would be unjust." 645 N.E.2d 601, 604-05 (Ind. 1994). The reasoning and holding in *Levin* apply with equal effect here. While Mother is not the biological or legal mother of the Child, the Child is nevertheless a child of this marriage. By agreement of the parties during the marriage the Child was conceived through the use of a surrogate. Mother should not be required to adopt the Child for her status as the Child's "mother" to be recognized. We cannot say that the trial court's assessment of the evidence is clearly erroneous, and we affirm its custody decision.

## *Issue Two: Support*

[9] Father next asserts that the trial court erred when it ordered him to pay child support because, according to Father's one-paragraph argument on this issue in his sixty-one-page brief, there is no evidence of either party's income in the record. But the court's findings expressly took notice of and incorporated the dissolution record. *See* Appellant's App. Vol. 4 at 201. And Father presents no argument on appeal that the dissolution record was insufficient to demonstrate the parties' respective incomes. *See* Ind. Appellate Rule 46(A)(8)(a).

Accordingly, we conclude that Father has failed to present argument supported by cogent reasoning and appropriate citations to the incorporated record on this issue, and, thus, he has not carried his burden of persuasion to show the court erred in the award of support.

## *Issue Three: Spoliation*

[10] Father also asserts that the trial court abused its discretion when it declined to draw a more serious negative inference against Mother for her deletion of some Facebook posts. As we have explained:

> Spoliation is a particular discovery abuse that involves the intentional or negligent destruction, mutilation, alteration, or concealment of physical evidence. We vest trial courts with wide discretion in dealing with discovery matters and will reverse a trial court's decision regarding discovery only for an abuse of discretion. We will find an abuse of discretion only if it is clearly against the logic and circumstances before the court, or when the trial court has misinterpreted the law.

*N. Ind. Pub. Serv. Co. v. Aqua Envtl. Container Corp.*, 102 N.E.3d 290, 300-01 (Ind. Ct. App. 2018) (citations and quotation marks omitted).

[11] According to Father, his attorney spent $1,937 to prove Mother's spoliation of the Facebook posts, and the trial court "failed to properly weigh [Mother's] intentional spoliation" of that evidence. Appellant's Br. at 51-52. The trial court recognized that Father's spoliation claim was "not without some degree of merit." Appellant's App. Vol. 4 at 219. The court simply concluded that the deleted Facebook posts would have not been significant and instead "would

have likely shown more . . . unkind commentary about Father, the type that both parties have made about the other throughout the divorce." *Id.* The trial court's assessment was within the logic and effect of the facts and circumstances before it. The court was not obliged to be more heavy-handed in its treatment of this issue, and we cannot say the court abused its discretion.

### *Issue Four: Attorney's Fees*

[12] Last, Father asserts that the court abused its discretion when it declined to order Mother to pay Father's attorney's fees. According to Father, the evidence shows that his parents' payment of his attorney's fees was a loan that he intended to repay, not a gift. Father continues that he was entitled to some offset of those fees from Mother because his costs were "due in large part to [Mother's] intentional false statements to the trial court that [the Child] was a child born of the marriage," because Mother "had falsely testified that her Facebook data had not been altered," and "[i]n consideration of [Mother's] scurrilous conduct throughout the scope of all the underlying consolidate[d] causes . . . ." Appellant's Br. at 58.

[13] We think the record most favorable to the trial court's judgment makes it clear that Father is in no position to critique Mother's behavior. Although there is statutory authority for an award of attorney's fees, parties are first presumed to pay their own attorney's fees and such an award lies within the sound discretion

of the dissolution court.[2] Jent has not shown that the trial court abused its discretion in not requiring Mother to pay all or any part of his attorney's fees. We affirm the court's judgment.

## Conclusion

In sum, we affirm the trial court's judgment in all respects.

Affirmed.

Kirsch, J., and Brown, J., concur.

---

[2] We note that, in its order on Father's motion to correct error, the trial court vacated its order that Father pay $5,000 of Dr. Gonso's fees.