

I N   T H E

# Court of Appeals of Indiana

**Pandel Ludwig,**

*Appellant-Plaintiff*

v.

**Flaherty & Collins, Inc.,**

*Appellee-Defendant*



FILED

Mar 16 2026, 10:14 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

---

March 16, 2026

Court of Appeals Case No.
25A-CT-941

Appeal from the Marion Superior Court

The Honorable Gary L. Miller, Judge

Trial Court Cause No.
49D03-2303-CT-13118

---

**Opinion by Judge DeBoer**
Judges Bradford and Weissmann concur.

**DeBoer, Judge.**

## Case Summary

Pandel Ludwig sued Flaherty & Collins, Inc. (Flaherty) after she slipped and fell on ice outside the fitness center in one of its apartment complexes. A jury returned a verdict in Flaherty's favor, and Ludwig moved for a new trial on two grounds. First, she argued the trial court had erred in rejecting her proposed jury instruction on spoliation of evidence given Flaherty's failure to preserve security camera footage from the day of her fall. Second, she claimed the way jurors completed the verdict form indicated they misunderstood the effect of their verdict. The court denied that motion, and Ludwig appeals. Because the court did not abuse its discretion in denying a new trial, we affirm.

## Facts and Procedural History

On the afternoon of January 8, 2022, Ludwig returned home to her apartment at a complex in Danville owned by Flaherty. As she did so, she noticed sleet and hail starting to fall and heard one of her neighbors tell a maintenance worker that it was "getting slick out . . . ." Transcript Vol. 3 at 39. She also received a weather alert on her phone notifying her of the "potential for bad weather" and she knew "there was [a] possibility of slick sidewalks . . . ." *Id.* at 40. Nonetheless, at around 6:00 p.m., she decided to take a short walk to the complex's fitness center. On the way, she saw that salt had been spread in front of her apartment building, which caused her to "walk with caution" in case there were any slick spots on the sidewalk. *Id.* at 41.

[3]     Ludwig arrived at the fitness center without incident.  After exercising for some time, Ludwig's daughter unexpectedly appeared outside the fitness center's door.  Ludwig let her in, and she told Ludwig that she had gotten into trouble at home.  Ludwig decided to cut her workout short and walk back to the apartment with her daughter.  Carrying a water bottle and cell phone in her hands, Ludwig left the fitness center through the same door she and her daughter had entered.  She slipped and fell on the icy sidewalk outside, breaking her ankle in multiple places.

[4]     A couple days later, Ludwig's boyfriend told the complex's office staff about Ludwig's fall and mentioned that security cameras inside the fitness center may have recorded the incident.  A Flaherty employee then reviewed the security camera footage.  The camera was pointed directly at the door where Ludwig had slipped, but its view was obstructed by exercise equipment.  *See infra Figure 1.*  The employee who reviewed the footage would later claim Ludwig's fall was not captured on the video, so she did not save it.  Flaherty's employees did, however, complete an incident report to memorialize that "Ludwig had gone to the gym [over the weekend] when she slipped and fell outside on the sidewalk . . . ." Exhibits at 22.



*Figure 1:* Ex. at 36.

Roughly one and a half weeks after Flaherty learned of the incident, Ludwig's attorney sent a letter of representation requesting "preservation of . . . video." Tr. Vol. 2 at 73. But the complex's security system was programmed to automatically delete video files after five to six days unless an employee manually saved them. So, by the time Flaherty received that letter, it claimed that all of the footage taken on the day of the incident had been recorded over.

In March 2023, Ludwig filed a complaint alleging Flaherty had negligently failed to, among other things, "maintain the sidewalks of the [complex] free of

ice and snow" or "use salt or another appropriate treatment timely when on notice of incoming precipitation . . . ." Appellant's Appendix Vol. 2 at 13. A two-day jury trial was held in March 2025. The missing security camera footage was a major theme of Ludwig's opening statement:

> This is a case about a corporation that does not do what it says it's going to do. Predictably hurt someone and then fail[] to keep the evidence.
>
> . . . .
>
> [A Flaherty employee] says they put salt out for freezing rain . . . . [I]nterestingly, you will find out that she says that . . . the video of the incident was deleted. Then she later on in the deposition says, no, I watched it, but then it didn't really show anything . . . because there's a giant exercise machine blocking the view of the door. But you'll also see that there's a big window right here with no blinds on it that has the sidewalk going to the door . . . . [S]o that video presumably would have shown whether a worker went down the sidewalk with salt. . . . But we don't have that video to show that they did what they said that they did.
>
> . . . .
>
> And if you look at all the evidence, we do ask you to use common sense about . . . [w]hat it really means when they say, oh, the video didn't show anything, but we don't have the video.

Tr. Vol. 2 at 17-21, 25.

[7]     Ludwig also highlighted the surveillance footage in her case-in-chief. Her attorney extensively questioned Flaherty's property manager about when

Flaherty was notified of Ludwig's fall and when the footage had been deleted, including in the following exchange:

> Q:     [Y]ou're saying that by the time you [knew] you need[ed] to preserve that video, the video had already been automatically deleted?
>
> A:     Correct.
>
> . . . .
>
> Q:     The letter I'm showing that we sent roughly a week and a half after [Ludwig's ] injury, . . . do you know how many days the surveillance in January 2022 would survive before deletion?
>
> A:     I believe I can't 100% say this, it's [five] or [six] days.

Tr. Vol. 2 at 74-75 (cleaned up).  He also asked her about what might have been depicted in the video had it been preserved:

> Q:     If that video had not been deleted . . . would it have captured the area that you understand [Ludwig] fell?
>
> A:     No.  . . . [Y]ou can't see out the door.  I mean it's got glass on it, but you could not see.
>
> Q:     Does [Flaherty] have any knowledge or opinion about how far away [Ludwig] was from the door when she fell?
>
> A:     No.  I don't remember that that information was ever given to us.  . . . Did she fall on this sidewalk, did she fall out there, did she fall on the grass?  I honestly do not know that.

> Q: If she would have fallen . . . immediately stepping out the door, if that video had been preserved, could it have seen her fall if the door was still open?
>
> A: It might have if the door was open, but it was dark and you could not see out the door.

*Id.* at 77-78 (cleaned up).

[8] After the close of evidence, the parties each submitted proposed final jury instructions to the trial court. Ludwig's proposed instructions included an adverse inference instruction based on Indiana Model Civil Jury Instruction 535—Failure to Produce Evidence (Spoliation). *See infra Figure 2.* Without explaining why, the court ruled from the bench it would not give the instruction.

**PLAINTIFF'S PROPOSED FINAL INSTRUCTION NO. 6**
**Failure to Produce Evidence (Spoliation)**

If Defendant Flaherty & Collins, Inc. fails to produce evidence under its exclusive control, you may conclude that the evidence Defendant could have produced would have been unfavorable to the Defendant's case.

*Figure 2:* Appellant's App. Vol. 2 at 28.

[9] Even without the instruction, Ludwig told the jury during her closing argument that it could infer the missing security camera footage would have been unfavorable to Flaherty's defense:

[Flaherty] could have done something to help you guys.  To help us know what the truth is, know for certain what the truth is.  We could have had a camera . . . outside the fitness center . . . .  At minimum, have the camera in the fitness center in a place that actually shows the door instead of showing people working out on the machine . . . .  And of course have a system that doesn't delete the video quickly.  . . .

[I]f the video actually shows what [Flaherty] say[s] it shows, be pretty darn sure that they would keep it.  . . . [Y]ou would think that if they had someone coming down, . . . all the way down, you would think that they would . . . want the video that shows someone walking past that window.  . . . There's no way that that video didn't show whether someone went . . . up and down that sidewalk.

Tr. Vol. 3 at 76-78.

[10]     Flaherty's counsel agreed the jury was free to make that inference, but argued the property manager had no incentive to delete evidence or lie about what the video would have shown had it been preserved:

Now I understand this argument about the video, but I want to break that down for a moment.  . . . [F]irst of all, you saw [the property manager].  . . . If you think that she purposefully destroyed evidence [in] furtherance of preserving the Flaherty . . . conspiracy, I can't stop you.  But, I guess I'd ask you, she's retiring, is that something you would expect her to do and to what end?

*Id.* at 87.  A more reasonable interpretation of the evidence, he argued, was that Flaherty "saw the weather was coming[,] . . . started salting[,] . . . continued to salt, and during that time period, [Ludwig] slipped and fell." *Id.* at 93.  And

according to Flaherty, Ludwig was mostly at fault for that fall because she chose to walk "in January in Indiana and she [knew] that [we were] in the middle of a weather event." *Id.* at 94.

[11] Following their deliberations, the jury returned a verdict apportioning ninety percent of the fault for Ludwig's injuries to her and ten percent to Flaherty.[1] *See infra Figure 3.* The trial court polled the jurors to confirm their verdict before releasing them.



*Figure 3:* Appellant's App. Vol. 2 at 79.

---

[1] The Indiana Comparative Fault Act requires the jury to "determine the percentage of fault of the claimant, of the defendant, and of any person who is a nonparty." Ind. Code § 34-51-2-7(b)(1). If the jury finds the plaintiff more than fifty percent at fault, it must "return a verdict for the defendant and no further deliberation of the jury is required." I.C. § 34-51-2-7(b)(2).

The day after trial, the court made the verdict form available for counsel to view on the Chronological Case Summary and indicated it would wait seven days to enter judgment. During that time, Ludwig filed a motion for a new trial arguing the crossed-out entries on the verdict form "provided *prima facie* evidence the jury had a fundamental misunderstanding of the instructions." *Id.* at 84. She also argued that the trial court's decision not to give the adverse inference instruction meant the jury did not know it was permitted to infer the missing surveillance footage was harmful to Flaherty's defense. The court denied that motion without written findings and entered judgment in Flaherty's favor. Ludwig now appeals.

## Discussion and Decision[2]

Motions for a new trial are governed by Indiana Trial Rule 59(J)(1), which provides that if the trial court "determines that prejudicial or harmful error has been committed, [it] shall take such action as will cure the error, including . . . [g]rant[ing] a new trial . . . ." Trial courts have "wide discretion to correct errors and to grant new trials." *Newland Res., LLC v. Branham Corp.*, 918 N.E.2d 763, 772 (Ind. Ct. App. 2009) (quoting *Leroy v. Kucharski*, 878 N.E.2d 247, 250 (Ind. Ct. App. 2007), *trans. denied*). We will reverse if the court abused its discretion, meaning its decision was "against the logic and effect of the facts

---

[2] We held oral argument in this case on February 12, 2025, in the Court of Appeals courtroom in Indianapolis. We thank counsel for the parties and amicus curiae, the Indiana Trial Lawyers Association, for their excellent written and oral presentations.

and circumstances before it[,]" or if the record demonstrates "a flagrant injustice has occurred[] or . . . the appellant has presented a very strong case for relief . . . ." *Id.* In our review, "we award the trial court's action with a strong presumption of correctness." *Pendleton v. Aguilar*, 827 N.E.2d 614, 624 (Ind. Ct. App. 2005), *reh'g denied*, *trans. denied*.

## 1. Spoliation of Evidence

[14] Ludwig first contends a new trial was warranted because of the trial court's failure to give her proposed adverse inference spoliation instruction to the jury. We generally "entrust instructing the jury to the sound discretion of the trial court, and we . . . review a trial court's instructions for an abuse of that discretion." *Ellis v. State*, 194 N.E.3d 1205, 1214 (Ind. Ct. App. 2022), *trans. denied*. When a party challenges the court's failure to give a proposed instruction, we determine whether (1) the instruction correctly stated the law, (2) the instruction was supported by evidence in the record, and (3) the substance of the instruction was covered by other instructions. *Humphrey v. Tuck*, 151 N.E.3d 1203, 1207 (Ind. 2020). The parties here primarily dispute whether the adverse inference instruction was supported by the evidence, so we focus our analysis there.

### A. Adverse Inference Instructions Generally

[15] Spoliation is the destruction, material alteration, or concealment of "evidence that a party has a duty to preserve for pending or reasonably foreseeable litigation." *Rosen v. Cmty. Healthcare Sys.*, No. 25S-CT-217, slip. op. at 7 (Ind.

Mar. 11, 2026).  It can occur in two forms: first-party and third-party spoliation. *Safeco Ins. Co. of Ind. v. Blue Sky Innovation Grp.*, 230 N.E.3d 898, 902 (Ind. 2024).  "First-party spoliation 'refers to spoliation of evidence by a party to the principal litigation,' and third-party spoliation refers to the spoliation of evidence 'by a non-party.'"  *Id.* (quoting *Gribben v. Wal-Mart Stores, Inc.*, 824 N.E.2d 349, 350 (Ind. 2005)).  The case at bar involves a claim of first-party spoliation, *i.e.*, spoliation by a party to this lawsuit.

[16]  Our Supreme Court has held that "[i]f spoliation by a party to a lawsuit is proved, rules of evidence permit the jury to infer that the missing evidence was unfavorable to that party."  *Glotzbach v. Froman*, 854 N.E.2d 337, 338 (Ind. 2006).  Indiana's Model Civil Jury Instructions provide an instruction that may be given to the jury when spoliation has occurred: "If a party fails to [testify about facts][produce a witness][produce documents] under the party's exclusive [knowledge][control], you may conclude that the [testimony the witness could have given][documents the witness could have produced] would have been unfavorable to the party's case."  Ind. Model Civ. Jury Instruction 535.  Ludwig requested that instruction be given here.

[17]  Generally, a "court may refuse a jury instruction only when '[n]one of the facts' in the record would support the legal theory offered in the instruction."  *Humphrey*, 151 N.E.3d at 1207 (quoting *Sims v. Huntington*, 393 N.E.2d 135, 139 (Ind. 1979)).  And here, Ludwig argues "[t]he trial contained an abundance of evidence indicating a spoliation instruction was appropriate and necessary . . . ."  Appellant's Brief at 15-16.  But two considerations lead us to the conclusion

that even when there is evidence that spoliation occurred, trial courts retain broad discretion to fashion an appropriate remedy, which may or may not include giving an adverse inference instruction.

[18] First, our Supreme Court recently reaffirmed the principle that a trial court will be found to have abused its discretion in deciding whether spoliation occurred and how to remedy it only if "its decision [was] unlawful, illogical, or otherwise unreasonable." *Rosen*, slip. op. at 6 (quoting *Expert Pool Builders, LLC v. Vangundy*, 224 N.E.3d 309, 312 (Ind. 2024)). And as this Court had previously recognized,

> [w]hen deciding whether to sanction a party for the spoliation of evidence, courts consider two primary factors: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party. Culpability can range along a continuum, from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation. Prejudice likewise can range along a continuum, from an inability to prove claims or defenses to little or no impact on the presentation of proof.
>
> . . . .
>
> . . . [T]he culpability versus prejudice balancing act . . . *is best left to the trial court*. And as we have observed, a variety of spoliation remedies are available to a party to litigation, such as potent discovery sanctions and an inference that the spoliated evidence was unfavorable to the party responsible.

*N. Ind. Pub. Serv. Co. v. Aqua Env't Container Corp.*, 102 N.E.3d 290, 303-40 (Ind. Ct. App. 2018) (emphasis added) (internal citations and quotation marks omitted).

To hold that the adverse inference instruction is "the only logical solution" to spoliation (as the Indiana Trial Lawyers Association (ITLA) urges us to do), Amicus Br. at 14, would require us to strip trial courts of their discretion to "[d]etermin[e] whether sanctions are warranted and, if so, what they should include . . . ." *Carmichael v. Separators, Inc.*, 148 N.E.3d 1048, 1060 (Ind. Ct. App. 2020) (quoting *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 189 (Ind. 2011)), *trans. denied.* And we would also need to ignore the observation from our Supreme Court that "it would be difficult to come up with a detailed approach to sanctions that would apply in every case . . . ." *Gordon*, 952 N.E.2d at 189.

[19] Second, our Supreme Court has recognized "that *intentional* first-party spoliation of evidence may be used to establish an inference that the spoliated evidence was unfavorable to the party responsible." *Gribben*, 824 N.E.2d at 351 (emphasis added). But it has never recognized the same for *negligent* spoliation, and the Court signaled in *Rosen* that it remains an open question under Indiana law "whether mere negligence is enough to justify the sanction of an adverse inference instruction, or whether instead something more is required." *Rosen*, slip. op. at 7 n.2. While *this Court* has appeared to suggest the adverse inference instruction may be given to sanction negligent spoliation, that notion seems to have entered our jurisprudence without analysis. *See, e.g., N. Ind. Pub. Serv. Co.*,

102 N.E.3d at 302, 304 (explaining that "[a] variety of spoliation remedies are available . . . , such as 'potent' discovery sanctions and an inference that the spoliated evidence was unfavorable to the party responsible" and remanding for "the trial court to determine the appropriate remedy, if any, for [a party's] *negligent* spoliation of evidence" (quoting *Shirey v. Flenar*, 89 N.E.3d 1102, 1107 (Ind. Ct. App. 2017) (contrasting remedies for first-party spoliation from third-party spoliation))) (emphasis added).

[20] While some jurisdictions do permit giving an adverse inference instruction as a sanction for negligent spoliation, many courts and scholars have expressly rejected that approach as illogical:

> [A]n adverse inference instruction makes little logical sense if given as a sanction for negligent breach of the duty to preserve, because the inference that a party failed to preserve evidence because it believed that the evidence was harmful to its case does not flow from [negligence]. . . . The more logical inference is that the party was disorganized, or distracted, or technically challenged, or overextended, not that it failed to preserve evidence because of an awareness that it was harmful.

Michael W. Deyo, *Deconstructing Pension Committee: The Evolving Rules of Evidence Spoliation and Sanctions in the Electronic Discovery Era*, 75 ALB. L. REV. 305, 325 (2012) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 526 (D. Md. 2010)).

Many courts, including the Seventh Circuit, have also reasoned that the adverse inference instruction is a harsh remedy, so to give the instruction there must be evidence the alleged spoliator acted not only intentionally, but in bad faith:

> In this circuit, when a party intentionally destroys evidence in bad faith, the judge may instruct the jury to infer the evidence contained incriminatory content. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). When considering the propriety of such an adverse inference instruction, "[t]he crucial element is not that the evidence was destroyed but rather the reason for the destruction." *Park v. City of Chi.*, 297 F.3d 606, 615 (7th Cir. 2002) (quoting *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.*, 695 F.2d 253, 258 (7th Cir. 1982)[, *reh'g denied, reh'g on banc denied*]) . . . . A party destroys a document in bad faith when it does so 'for the purpose of hiding adverse information.'" *Faas*, 532 F.3d at 644 (quoting *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558 (7th Cir. 2001)).

*Bracey v. Grondin*, 712 F.3d 1012, 1018-19 (7th Cir. 2013), *reh'g denied*, *cert. denied* (first alteration in original); *see also Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 41-42 (1st Cir. 2017) (instructing jurors they're "entitled in [their] deliberations to draw a negative inference . . . 'usually makes sense only where the evidence permits a finding of bad faith destruction.'" (quoting *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010), *cert. denied*)) (alteration in original); *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 79 (3d Cir. 2012) ("[A] finding of bad faith is pivotal to a spoliation determination."); *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015) ("'Mere negligence in losing or destroying' evidence is not enough to support imposition of" adverse inferences. (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009))), *cert denied*.

Further complicating our analysis is that this case involves a claim that electronically stored information (ESI) was spoliated. *See, e.g., Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 16-17 (Tex. 2014) (analyzing allegation that surveillance footage was recorded over as a claim of spoliated ESI). As many legal professionals and jurists have come to realize,

> [p]reservation of ESI presents challenging issues because ESI may easily be inadvertently destroyed through automatic processes. To ensure that spoliation does not occur, parties may need to take affirmative steps to prevent the deletion or modification of ESI. The spoliation issue is very real and arises from one basic problem: most companies follow a regular practice of rotating and writing over backup tapes. This process, of course, eliminates the original data, and may constitute spoliation.

Hon. Peter M. Laurait (Ret.), et al., 49A MASS. PRAC. SERIES, § 7:20 (Oct. 2025).

Until recently (and at the time trial was held in this cause), Indiana Trial Rule 37 *did not* permit the imposition of sanctions when ESI was "lost as a result of the routine, good faith operation of an electronic information system." Ind. Trial Rule 37(E) (2025). But effective January 1, 2026, that rule was amended to more closely resemble its federal counterpart.[3] Unlike the federal rule,

---

[3] Rule 37(e) of the Federal Rules of Civil Procedure provides:

> If [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

however, Rule 37 now makes an adverse inference instruction available without proof of intent so long as the non-spoliating party has been prejudiced by the loss of ESI:

> A court may impose sanctions on a party for failing to take reasonable steps to preserve [ESI] that is relevant, material to the litigation, should have been preserved in anticipation of or during litigation and is lost because a party fails to take reasonable steps to preserve it, cannot be restored or replaced through additional discovery, and *either prejudice results to another party from loss of the information **or** the party acted with the intent to deprive another party of the information's use in the litigation*.

> The sanctions available to the court include the following: a presumption that the lost information was unfavorable to the party, an instruction the jury must presume the information was unfavorable to the party,[4] dismissal of the action, entry of a default judgment, or other orders as are just and necessary to cure the prejudice.

---

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

> (2) *only upon finding that the party acted with the **intent** to deprive another party of the information's use in the litigation may:*

>> (A) presume that the lost information was unfavorable to the party;

>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>> (C) dismiss the action or enter a default judgment.

(emphasis added); *see also Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025) (Under FRCP Rule 37(e), "only the *intentional* loss or destruction of [ESI] gives rise to an inference that the evidence was unfavorable to the party responsible for that loss or destruction . . . .").

[4] Thus, in the case of spoliated ESI, Indiana law now permits a *mandatory* adverse presumption instruction (*i.e.*, "*must* presume") that is even harsher than the permissive adverse inference instruction one contemplated by Model Instruction 535 (*i.e.*, "*may* conclude").

(emphasis added).

[24] But given the recency of these amendments, Indiana's courts have not had the opportunity to comment on how to analyze claims of spoliated ESI under Rule 37(D), let alone discuss whether and when courts should give the mandatory adverse presumption instruction now permitted by the rule. *See supra* note 4. Nor is it clear under *Rosen* whether the amendments to Rule 37 indicate that our Supreme Court agrees with the federal Advisory Committee "that ESI is inherently different from other forms of evidence and merits a different standard for spoliation sanctions than that applied to other forms of evidence." Hon. Shira A. Scheindlin, et al., *The Adverse Inference Instruction After Revised Rule 37(E): An Evidence-Based Proposal*, 83 FORDHAM L. REV. 1299, 1312 (2014).

[25] That said, we do not comment further on these unresolved issues here, as the parties did not brief them and Flaherty rejected our invitation at oral argument to explore this topic in depth and instead conceded that negligence would have been enough to support giving the permissive adverse inference instruction Ludwig requested at trial. For the purposes of this opinion, we therefore assume without deciding that Indiana law permits the giving of an adverse inference instruction when there is evidence a party negligently or intentionally spoliated surveillance footage. And we confine the remainder of our discussion to the three points of contention raised by the parties: (1) whether Flaherty had a duty to preserve video from the day of Ludwig's fall; (2) whether Flaherty negligently or intentionally breached that duty; and (3), if so, whether the trial court's failure to give the adverse inference instruction was harmless.

## B. Duty and Breach

As the party claiming spoliation, Ludwig was required to prove "(1) there was a duty to preserve the evidence, and (2) [Flaherty] either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence." *N. Ind. Pub. Serv. Co.*, 102 N.E.3d at 301. The parties first disagree as to whether Flaherty had a duty to preserve surveillance footage from the day of Ludwig's fall. According to Ludwig, Flaherty was obligated to preserve that video because it was notified of her injuries two days after the incident and was "sophisticated enough to be apprised of the possibility of litigation and the need to preserve evidence . . . ." Appellant's Br. at 16. Flaherty claims that it had no such duty because there was "no evidence to suggest [Flaherty] knew litigation was possible before the video re-recorded." Appellee's Br. at 14. We agree with Ludwig.

A duty to preserve evidence arises "when a first-party claimant 'knew, or at the very least, should have known, that litigation was possible, if not probable.'" *Golden Corral Corp. v. Lenart*, 127 N.E.3d 1205, 1217 (Ind. Ct. App. 2019) (quoting *N. Ind. Pub. Serv. Co.*, 102 N.E.3d at 301), *trans. denied*. To determine whether Flaherty should have known litigation was possible, we need look no further than the fact that it learned of Ludwig's fall two days after it happened when her boyfriend reported the incident to the complex's office staff. We see no reason why a sophisticated landlord who operates apartment complexes across multiple states would not know that litigation is possible when it learns that a tenant slipped, fell, and was injured on one of its properties. Indeed,

upon being notified of the fall, the complex's office staff promptly prepared an incident report, which should have put higher-level Flaherty representatives on notice of the need to preserve relevant evidence.

[28] That said, the scope of Flaherty's duty to preserve surveillance footage is not obvious. As this Court has previously recognized, "a [business], upon recognizing the threat of litigation, need not 'preserve every shred of paper, every e-mail or electronic document, and every backup tape,' as such a rule would 'cripple large corporations . . . that are almost always involved in litigation.'" *Miller v. Fed. Exp. Corp.*, 6 N.E.3d 1006, 1013 (Ind. Ct. App. 2014) (quoting *Zubulake*, 220 F.R.D. at 217), *trans. denied*. In *Rosen*, for example, our Supreme Court found a hospital did not breach its duty to preserve when it saved a portion of security footage depicting the moment an individual tripped over a floor mat but did not preserve "earlier footage [that] might have shown the mat was disheveled . . . ." Slip. op. at 8. Demonstrating that breach of the duty to preserve is a fact-sensitive inquiry that often turns on the specific circumstances of each case, the Court reasoned that because the mat was far from the camera and difficult to see on the footage, "it was reasonable for the trial judge to conclude that earlier video would have been no more enlightening." *Id.*

[29] Ludwig argues that under the specific facts of this case, Flaherty's duty to preserve extended beyond the portion of the surveillance footage around the time of her fall and encompassed footage from hours earlier. She explains this was so because the "employees who claimed to have spread salt where Ludwig

fell would have been visible . . . as they passed the large window" next to where she fell. Appellant's Br. at 16. And such an expansive duty to preserve is crucial to Ludwig's argument on appeal, as her discussion of the missing video during her closing argument focused almost entirely on what surveillance footage from hours before her fall might have shown had it been preserved.

[30] Flaherty contends that a rule requiring businesses to not only save surveillance footage from immediately before, during, and after a fall but also from hours earlier would be overly burdensome. There is some merit to Flaherty's position, as "a litigant is under no duty to keep or retain every document in its possession" and need only "preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery[,] and/or is the subject of a pending discovery request." *Miller*, 6 N.E.3d at 1013 (quoting *Zubulake*, 220 F.R.D. at 217). While it's clear to us that a property owner should reasonably know that surveillance footage from *some* time before, during, and after a fall might be relevant to litigation, Flaherty might be right that it could not have reasonably foreseen that Ludwig would request footage from hours earlier.

[31] But we are mindful that Ludwig's counsel requested footage from Flaherty less than two weeks after her fall. We agree with ITLA that "[w]e must place the duty of preservation of evidence on the party with control[,]" as well as the consequences that accompany a failure to do so. Amicus Br. at 14. As Flaherty's counsel acknowledged at oral argument, modern surveillance

systems retain footage for much longer than five days.[5]  And the present case is distinguishable from *Rosen* because there, the hospital preserved some video of the fall—which was reasonable under the circumstances—while here, Flaherty failed to preserve any footage at all.  *See Rosen*, slip. op. at 11 (a party "must do what is reasonable given the circumstances").

[32]  We do not draw any bright line as to how long Flaherty's system should have retained footage from the day of the incident, but it suffices to say that after being notified of Ludwig's fall two days after the fact, it was not reasonable for Flaherty to permit its system to automatically delete footage from that day in as little as five days.  And when Ludwig requested video from Flaherty a mere two weeks later, she could have reasonably expected that it had not been deleted.  We therefore find that Flaherty's failure to preserve the video during that short time frame was at least negligent.

[33]  Nonetheless, we will not remand a case for a new trial when the trial court's failure to give a jury instruction resulted in harmless error.  *See Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 944 (Ind. 2001) (a party "seeking a new trial on the basis of an improper jury instruction must show 'a reasonable probability that [their] substantial rights . . . have been adversely affected.'" (quoting *Peak v. Campbell*, 578 N.E.2d 360, 362 (Ind. 1991))); *see also* Ind.

---

[5] Specifically, Flaherty's counsel conceded the security system in place at the time of Ludwig's fall was "older" and that a modern system would have held on to footage for a longer period before it was automatically deleted.

Appellate Rule 66(A) ("No error or defect in any ruling or order. . . is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties."). We therefore turn to Flaherty's claim that "any alleged error was harmless . . . ." Appellee's Br. at 22.

## C. Harmless Error

To show that her substantial rights were adversely affected, Ludwig was required to prove the trial court's erroneous instructions "could have formed the basis for the jury's verdict." *Torrence v. Gamble*, 124 N.E.3d 1249, 1251 (Ind. Ct. App. 2019). And with respect to the failure to give a permissive adverse inference instruction, proving as much is a difficult task. Though some courts have described the instruction as extremely harmful to the alleged spoliator's case, our Supreme Court has noted it's difficult to determine what a jury would have done with the instruction if it had been given:

> [E]ven if the jury infers from the act of spoliation that the spoliated evidence was somehow unfavorable to the spoliator, there will typically be no way of telling what precisely the evidence would have shown and how much it would have weighed in the spoliation victim's favor. Without knowing the content and weight of the spoliated evidence, it would be impossible for the jury to meaningfully assess what role the missing evidence would have played in the determination of the underlying action. The jury could only speculate as to what the nature of the spoliated evidence was and what effect it might have had on the outcome of the underlying litigation.

*Gribben*, 824 N.E.2d at 354-55 (quoting *Cedars-Sinai Med. Ctr. v. Superior Ct.*, 954 P.2d 511, 518 (Cal. 1998)).  Indeed, as noted above, Indiana's model spoliation instruction (which Ludwig requested here) would have merely instructed the jury that it *may*, not must, have made an adverse inference against Flaherty, and even then, it did not indicate what weight the jury should have given that inference.  *See* Ind. Model Civ. Jury Instruction 535.

[35]     That said, under the present circumstances, even if the jury had been given the instruction, we agree with Flaherty that Ludwig "cannot escape her own comparative fault which obviously weighed heavily on the jury."  Appellee's Br. at 22.  The jury heard testimony about the missing video, heard arguments from Ludwig *and Flaherty* that it could infer the video would prove that Flaherty had not salted the sidewalk, and still it found that Ludwig was overwhelmingly at fault for her injuries.  Even assuming Flaherty failed to salt the sidewalk outside the fitness center, the jury's 90-10 comparative fault allocation was supported by the evidence.  After all, Ludwig chose to walk outside in the middle of an ice storm and testified that it was "common sense" that even when a walkway has been salted, that "doesn't mean necessarily there's no slick spots."  Tr. Vol. 3 at 41.

[36]     Said differently, this case was not a close call.  We are mindful of our former Chief Justice's observation that it's easier to find reversible error when the verdict was close, for example, "where [a] 1% difference in fault separate[d] a defense verdict from a plaintiff's verdict."  *Penn Harris Madison Sch. Corp. v. Howard*, 861 N.E.2d 1190, 1198 (Ind. 2007) (Shepard, C.J., dissenting).  In

contrast, when the jury has assigned most of the fault to the plaintiff by, for example, returning "a defense verdict at 65-35, not really a close call, . . . the erroneous instruction '[would not have] affect[ed] the substantial rights of the parties . . . .'" *Id.* (quoting Ind. Trial Rule 61).

[37] We further note the trial court's decisions regarding spoliation were even harsher in *Rosen* than here, as it "barred any argument, questions, testimony, or evidence suggesting that (a) video footage existed or does exist[;] (b) substantiating plaintiff's claim of negligence; [and] (c) that was or is being withheld or has been destroyed by defendants or by defendants' attorneys." Slip. Op. at 14 (internal quotation marks omitted). In contrast, Ludwig was allowed to argue and introduce evidence at trial that Flaherty failed to produce surveillance footage from the day of the incident and made that failure a major theme of her opening statement, examination of witnesses, and closing argument. Since the Supreme Court found no error in the court's decision to bar evidence of spoliation in *Rosen*, it's difficult to find reversible error here since Ludwig was permitted to present such evidence.

[38] And we reiterate that given the jury's apparent rejection of Ludwig's invitation to hold the missing footage against Flaherty, it was unlikely that an instruction on spoliation would have affected their verdict, particularly the *permissive* adverse inference instruction Ludwig requested. As such, Ludwig has failed to show that her substantial rights were adversely affected by the trial court's decision not to give the spoliation instruction. Consequently, to the extent that decision was erroneous, it was harmless.

## 2. The Verdict Form

[39] Ludwig next argues that a new trial should have been granted because "[t]he verdict form clearly revealed a meaningful risk the jurors had a fundamental misunderstanding of what they communicated as their verdict." Appellant's Br. at 20. She contends the verdict form had "multiple verdicts crossed out, various comparative fault percentages assigned . . . then subsequently crossed out, the foreperson's signature crossed out, the date of the verdict crossed out, a new purported final assessment of percentages, and a new signature and date entered." *Id.* at 19-20. And according to Ludwig, this was "the textbook definition of [an] extraordinary" verdict. *Id.* at 19.

[40] As an initial matter, Ludwig has failed to cite any legal authority standing for the proposition that a new trial should be granted if a jury's verdict is "extraordinary," nor has she explained with any specificity what it means for a verdict to be "extraordinary" in this context. In fact, her argument on this issue does not cite any legal authority *at all*. This runs afoul of Indiana Appellate Rule 46(A)(8)(a), which requires the parties to support their arguments with "citations to the authorities [and] statutes . . . relied on . . . ." By failing to do so, Ludwig has waived this issue for our review. *See Miller v. Patel*, 212 N.E.3d 639, 657 (Ind. 2023) ("[A] litigant who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for . . . review." (quoting *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015)).

[41]     Waiver notwithstanding, we agree with Ludwig insofar as she argues it would have been best practice for the trial judge to permit counsel to examine the verdict form before releasing the jury. When trial courts do so, it gives the parties an opportunity to address any "substantial irregularities that reasonably indicate a risk the jury did not record the verdict properly." Appellant's Br. at 23-24. But we have found no authority standing for the proposition that trial courts are required to follow that practice. And in any event, Ludwig is incorrect that under the specific circumstances of this case a new trial is required to "assure the verdict [was] free from mistake . . . ." Appellant's Br. at 24.

[42]     If there is any doubt as to the jury's intention in returning a verdict, one remedy is to poll it "to assure that each of the jurors accepts the verdict as his own and to provide for further jury deliberation where polling reveals a juror dissents from the verdict." *State v. Normandy Farms*, 413 N.E.2d 268, 271 (Ind. Ct. App. 1980). For example, in *Foddrill v. Crane,* a panel of this Court rejected the defendant's argument "that the jury's award was based on a miscalculation[,]" reasoning:

> [A] jury's general verdict in a negligence case may not be impeached by a damages calculation form, at least so long as it is clear that the general verdict is indicative of each juror's intent. . . . Here, . . . the jury was polled and all members affirmed that [the award] was his or her verdict.

894 N.E.2d 1070, 1080, 1081 (Ind. Ct. App. 2008), *trans. denied*.

[43]     Likewise, here, the trial court polled the jurors to ensure each of them intended to assign ninety percent of the fault for Ludwig's injuries to her and return a verdict in Flaherty's favor:

> THE COURT: . . . The verdict forms have been tendered to the court. One is filled out. And it reads as follows. . . . [W]e, the jury, assigned the following percentages of fault. . . . Ludwig 90%, Flaherty . . . 10%. Because Ludwig's fault is greater than 50%, we therefore decide in favor of the Defendant Flaherty . . . and against . . . Ludwig, signed by the presiding juror and dated today's date. Juror number 1, is that your verdict?
>
> JUROR #1: Yes.
>
> THE COURT: Juror #2?
>
> JUROR #2: Yes.
>
> THE COURT: Juror #3?
>
> JUROR #3: Yes.
>
> THE COURT: 4?
>
> JUROR #4: Yes.
>
> THE COURT: 5?
>
> JUROR #5: Yes.
>
> THE COURT: And 6?

JUROR #6: Yes.

Tr. Vol. 3 at 107-08. From this, there is no doubt the verdict form completed by the jury accurately reflects its intention to find in Flaherty's favor and award no damages to Ludwig.

[44] Nor is Ludwig correct that the trial court was required to specifically ask the jurors, "Is your verdict that . . . Ludwig receives no compensation from . . . Flaherty[?]" to alleviate the supposed risk the jurors did not understand a verdict in Flaherty's favor would result in Ludwig receiving no compensation for her injuries. Appellant's Br. at 23. The court's final instructions explicitly explained:

> To decide if . . . Ludwig is entitled to recover damages from Flaherty . . . apportion the fault of . . . Ludwig and Flaherty . . . on a percentage basis. Do this as follows:
>
> First, if you determine that Flaherty . . . was not at fault, return your verdict for Flaherty . . . and against . . . Ludwig and deliberate no further.
>
> If Flaherty . . . is at fault[:] decide Flaherty['s] . . . percentage of fault, and the percentage of fault, if any, of . . . Ludwig that caused . . . Ludwig's injuries. . . .
>
> Next, if . . . Ludwig's fault is greater than 50 percent, return your verdict for Flaherty . . . and against . . . Ludwig in this case and deliberate no further.

However, if you decide that . . . Ludwig's fault is 50 percent or less, then:

(1)      Decide the total amount of . . . Ludwig's damages, if any. Do not consider fault when you decide this amount.

(2)      Multiply . . . Ludwig's total damages by Flaherty['s] . . . percentage of fault.

(3)      Return your verdict for . . . Ludwig and against Flaherty . . . in the amount of the product of that multiplication.

Appellant's App. Vol. 2 at 70.

[45]    By these instructions, the jury was informed that it should only award damages to Ludwig if her fault was less than or equal to fifty percent. Because the jury found Ludwig ninety percent at fault, it stopped deliberating and awarded no damages in accordance with the trial court's instructions. *See Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994) ("A jury is presumed to have followed the court's instructions."), *reh'g denied*, *trans. denied*. Even if Ludwig had been given the opportunity to raise issues with the verdict form before jurors were released, once each juror confirmed the form's accuracy, there was no need for the court to subject the verdict to additional scrutiny. Since each juror did so, a new trial was not warranted merely because the jury crossed out items on the verdict form.

## Conclusion

For these reasons, the trial court did not abuse its discretion in denying Ludwig's motion for a new trial, and we affirm.

Affirmed.

Bradford, J., and Weissmann, J., concur.

ATTORNEYS FOR APPELLANT

Jamison J. Allen
Nicole K. Szablak
Marc Lopez Law Firm
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Karl G. Popowics
Goodin Abernathy, LLP
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE THE INDIANA TRIAL LAWYERS ASSOCIATION

Katherine A. Piscione
Waldron Tate Land LLC
Indianapolis, Indiana